Filed 2/24/14  Frank E. Rogozienski, Inc. v. Hylton CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| FRANK E. ROGOZIENSKI, INC. et al., Plaintiffs and Appellants, v. ELDON HYLTON et al., Defendants and Respondents. | D063303 (Super. Ct. No. 37-2011-00088273-CU-MC-CTL) |


APPEAL from an order of the Superior Court of San Diego County, Jeffrey B. Barton, Judge.  Affirmed.


Frank E. Rogozienski for Plaintiffs and Appellants.

Waxler Carner Brodsky and Barry Z. Brodsky, Christopher L. Wong for Defendant and Respondent Eldon Hylton.

Stephen M. Hogan for Defendants and Respondents Matthew V. Herron, Herron+Steele and Herron Law.

Plaintiffs and appellants Frank E. Rogozienski, Inc. and Frank E. Rogozienski, individually and as trustee of the Frank E. Rogozienski Family Trust (collectively Rogozienski) sued defendants and respondents Matthew V. Herron, Herron + Steele, APC, and Herron Law, APC (collectively the Herron defendants) and the Herron defendants' client, Eldon Hylton, for malicious prosecution.  Hylton and the Herron defendants successfully moved to strike the complaint under Code of Civil Procedure section 425.16, commonly known as the anti-SLAPP (strategic lawsuit against public participation) law.  Asserting the motions should have been denied, Rogozienski contends:  (1) the trial court erred by overruling his objections to certain evidence presented in support of Hylton's motion; (2) he demonstrated prima facie that Hylton's voluntary dismissal of the underlying action constituted a favorable termination; and (3) he made a prima facie showing that Hylton and the Herron defendants acted with malice.

We conclude Rogozienski has not met his burden to make a prima facie showing of malice as to either Hylton or the Herron defendants.  We therefore affirm.

FACTUAL AND PROCEDURAL BACKGROUND

On our review of the court's order on Hylton's and the Herron defendants' anti-SLAPP motions, we accept as true the competent and admissible evidence presented by Rogozienski and only consider defendants' evidence to the extent it defeats Rogozienski's evidence as a matter of law.  (*Hylton v. Rogozienski* (2009) 177 Cal.App.4th 1264, 1267,

2

fn. 2 (*Hylton I*); *Tuchscher Development Enterprises, Inc. v. San Diego Unified Port District* (2003) 106 Cal.App.4th 1219, 1236.)[1]

Hylton was a co-founder, president and director of DivX Networks, Inc. (DivX), a company formed to commercialize video compression technology. In August 2000, Hylton purchased three million shares of DivX common stock for $3000 under the terms of a founder stock purchase agreement. The founder stock purchase agreement contained a provision granting DivX the right to reacquire shares of DivX stock under certain circumstances, including Hylton's termination from employment with cause.[2] On

---

[1]    The trial court granted the parties' requests for judicial notice, which included Hylton's request as to all of the documents in the underlying action, and the Herron defendants' request as to all of the documents in *Hylton v. DivX Networks, Inc. et al.* (Super. Ct. S.D. County, 2003, No. GIC 783404) (the *Hylton v. DivX* action). Thus, while the court excluded the vast majority of Rogozienski's lodged exhibits, to the extent they constituted pleadings in the underlying action or Hylton's action against his former employer, their existence may properly be considered, but not the truth of their factual contents. (*Big Valley Band of Pomo Indians v. Superior Court* (2005) 133 Cal.App.4th 1185, 1192.)

[2]    The provision reads in part: "Unvested Share Repurchase Option. In the event the Purchaser's employment with the Company is terminated for Cause, as hereinafter defined, or if the Purchaser or the Purchaser's legal representative attempts to sell, exchange, transfer, pledge or otherwise dispose of any shares purchased pursuant to this Agreement which have not vested in the Purchaser pursuant to Section 2(a) below (the 'Unvested Shares'), the Company shall have the right to reacquire the Unvested Shares under the terms and subject to the conditions set forth in this Section 2 (the 'Unvested Share Repurchase Option')." The agreement sets forth an initial vesting date of February 1, 2001, for the first one-fourth of the stock and incremental vesting of the remaining shares "[f]or each full month of the Company's employment of Purchaser as an employee following one month from the Initial Vesting Date." The agreement further provides that with the exception of certain transfers to ancestors, descendants, spouse or trustees, DivX could exercise the unvested share repurchase option by written notice to a defined escrow agent and to Hylton or his legal representative within sixty days of either Hylton's termination for cause or his attempted disposition of shares.

3

February 16, 2001, DivX terminated Hylton's employment.  Believing he had been wrongfully terminated, Hylton consulted with legal counsel and eventually engaged in an unsuccessful mediation with DivX partly over whether his DivX shares had vested absent Hylton's continued employment with DivX; Hylton taking the position that all of his shares had automatically vested upon his termination without cause.

Hylton then met with Rogozienski, who reviewed Hylton's stock certificate, the founder stock purchase agreement and other DivX corporate documents.  DivX did not attempt to exercise its rights under the founder stock purchase agreement, nor did it tender payment or open an escrow in the 10 months after Hylton's termination.  Nevertheless, in December 2001, Hylton signed a legal services contract in which he agreed to pay Rogozienski a contingent fee that was defined to include recovery of any portion of the three million shares of DivX stock issued and sold to Hylton under the founder stock purchase agreement "which are confirmed, awarded, or otherwise retained by" Hylton.

In February 2002, Rogozienski filed on Hylton's behalf the *Hylton v. DivX* action, in which Hylton alleged in part that DivX had breached the founder stock purchase agreement by purporting to terminate his right to the three million shares of DivX stock.  The complaint further alleged that DivX had no legitimate right to repurchase any of the three million shares of DivX stock because it had not terminated Hylton for cause, given written notice of its repurchase option, or made any timely cash payment for repurchase of the shares.  The *Hylton v. DivX* action entailed multiple depositions and discovery, document review, and trial preparation.  The case eventually settled under an agreement

4

by which DivX paid Hylton $125,000 and warranted that Hylton owned his three million DivX shares. The settlement eliminated DivX's unvested share repurchase option. For his fee, Rogozienski received one-third of the settlement, which included transfer to him of one million shares of Hylton's DivX stock.

In September 2006, Hylton called Rogozienski about the status of his shares. Rogozienski confirmed that the unvested share repurchase option had been removed, and informed Hylton that he (Rogozienski) was not selling shares in the DivX initial public offering and thus had declined to sign a lockup agreement presented to him by DivX and J.P. Morgan Securities.

*The Underlying Fraud Action Against Rogozienski*

In August 2007, the Herron defendants on Hylton's behalf filed a complaint against Rogozienski, *Hylton v. Rogozienski, et al.* (Super. Ct. S.D. County, 2007, No. 37-2007-00072299-CU-PN-CTL) for rescission, restitution, and declaratory relief. The trial court sustained a demurrer to the complaint as barred by the statute of limitations, but granted Hylton leave to amend.

In January 2008, Hylton filed a first amended complaint including a fourth cause of action for fraud and a fifth cause of action for rescission and restitution based on fraud. Hylton alleged that while Rogozienski had included a claim related to Hylton's DivX stock in the *Hylton v. DivX* action, there was no actual dispute over Hylton's ownership of those shares because DivX had not terminated his employment for cause and the repurchase option held by DivX under the founder stock purchase agreement had lapsed, unexercised. He alleged Rogozienski had reviewed that agreement and advised him that

5

the DivX stock belonged to Hylton, but, knowing the stock's value and hoping to obtain some shares as a fee, Rogozienski represented that legal action was necessary to protect the stock from DivX's claims in order to induce Hylton to sign the legal services contract.[3] Based on these allegations, Hylton sought to rescind the legal services contract and obtain restitution of the stock proceeds. Rogozienski unsuccessfully demurred to Hylton's first amended complaint, and also brought an anti-SLAPP motion to strike it. This court affirmed the trial court's denial of Rogozienski's anti-SLAPP motion in *Hylton I*, *supra*, 177 Cal.App.4th 1264, on grounds Rogozienski did not meet his threshold burden to show Hylton's action was subject to the anti-SLAPP law. (*Id.* at p. 1275.)

Rogozienski propounded requests for admissions, form interrogatories and special interrogatories, as well as other discovery regarding Hylton's fraud claims. Hylton responded, and also appeared for a partial day of his deposition. In amended responses to Hylton's form interrogatory No. 17.1, Hylton set out his theory of fraud, which was that there was no claim by DivX that Hylton had any contractual obligation to return the three

---

3    Hylton alleged that after his initial consultation with Rogozienski, during which Rogozienski reviewed the founder stock purchase agreement, Rogozienski "recognized that [Hylton's] stock was worth many millions of dollars and he might be able to mislead [Hylton] to use a portion of these shares as a 'contingent fee' if [Hylton] were convinced that a lawsuit was needed to protect [Hylton's] ownership interest" and Rogozienski "knew there would be no basis to claim the shares as a fee if he were retained only to prosecute a wrongful termination claim, but that he might be able to exploit the unusual use of the term 'vested' in the [founder stock purchase agreement] to make it appear that [Hylton's] ownership was at risk in order to convince [Hylton] to agree to turn over a portion of his stock to litigate ownership of the stock, knowing that DivX had not exercised the Repurchase Option, which had lapsed months before." Hylton alleged he relied on these representations in executing Rogozienski's fee agreement.

6

million shares of stock, but Rogozienski had manufactured a sham dispute by misinterpreting the vesting provision of the founder stock purchase agreement and had Hylton sign a contingent fee agreement over stock Hylton already owned "regardless of: (a) whether the ownership was at risk; (b) the value of the stock or the services which [Rogozienski] would render; and (c) whether [Rogozienski's] services had any causal connection to whether the stock was 'otherwise retained' as a consequence of [Rogozienski's] legal services."

On April 29, 2010, the trial court ordered Hylton to appear in July 2010 for his continued deposition until its completion. It also ordered Hylton to respond to certain discovery by May 14, 2010. On July 30, 2010, the court heard Rogozienski's motion to compel discovery, to recover costs of Hylton's failure to appear at his deposition, and for sanctions, and tentatively ordered Hylton to provide further, code-compliant responses to Rogozienski's request for admission No. 12 and form interrogatory No. 17.1 without objections, and to provide all responsive documents. It ordered Hylton to pay Rogozienski monetary sanctions as well as reimburse Rogozienski costs for Hylton's nonappearance at his deposition. The court further ordered Hylton to notify Rogozienski's counsel whether he elected to complete his deposition in San Diego or China.

On August 9, 2010, Matthew Herron sought to file on shortened time a motion to withdraw as Hylton's counsel. In a sworn declaration, he stated the case was set for trial on October 1, 2010, and Hylton had engaged in conduct rendering it impossible for him to continue as Hylton's counsel. Herron averred that Hylton's only communication was

7

via his companion, a Chinese national, who did not respect the need to comply with the superior court's orders; made it impossible to prosecute the case within the court-imposed time frames; and had informed him that Hylton refused to be deposed.

On August 10, 2010, the trial court issued its final ruling on Rogozienski's motion to compel discovery. It confirmed its tentative ruling, and, observing the parties had met and conferred through counsel, further ordered Hylton to provide document responses and produce documents, and to pay all costs, expenses and fees if he chose to be further deposed in China. That day, Herron filed a request for dismissal of the entire action without prejudice. The trial court later entered a judgment of dismissal awarding Rogozienski $9,325.35 in costs.

*The Present Malicious Prosecution Action Against Hylton and the Herron Defendants*

In March 2011, Rogozienski sued Hylton and the Herron defendants for malicious prosecution. In part, he alleged that in filing and prosecuting the underlying action they acted maliciously and without probable cause, without investigation or research into the facts and in willful disregard of Rogozienski's rights in order to force him into a settlement of "fabricated claims of fraudulent misconduct . . . ." As to the Herron defendants, Rogozienski alleged they "harbored ill will against [Rogozienski] because immediately prior to filing the Underlying Litigation, [they were] abruptly discharged in an unrelated fee-for-service matter they were handling for a client who was dissatisfied with their work and replaced them with . . . Rogozienski."

8

*The Herron Defendants' Special Motion to Strike*

The Herron defendants moved to strike Rogozienski's complaint under Code of Civil Procedure section 425.16. The trial court tentatively granted the motion on grounds Rogozienski had not established Hylton's termination of the action was in his favor; he had not shown the dismissal was based on Hylton's concession that his case lacked merit. Following oral argument, however, the court denied the motion, ruling Rogozienski had presented a prima facie case of favorable termination, lack of probable cause and malice, and the Herron defendants had failed to produce any evidence to support their claim that Hylton had dismissed the underlying lawsuit not because he was losing, but for some other reason.

*Hylton's Special Motion to Strike*

Thereafter, Hylton specially moved to strike the complaint. He argued Rogozienski's action arose from conduct protected under the anti-SLAPP law—Hylton's act of filing the underlying action—and Rogozienski could not meet his burden to demonstrate a likelihood of success on the merits of that action. Hylton maintained Rogozienski could not demonstrate a favorable termination of the *entire* action as three of the five causes of action were dismissed on statute of limitations grounds and Rogozienski could not show Hylton's voluntary dismissal of the remaining causes of action was a favorable termination because at the time of the dismissal, Hylton had been suffering from life-threatening health issues and continued prosecution of the action would have required Hylton to pay all of Rogozienski's travel expenses to China, expenses for a court reporter and videographer to travel to China for his continued

9

deposition, and the cost of retaining new counsel. Hylton also maintained Rogozienski could not demonstrate malice on Hylton's part in filing and prosecuting the underlying action; in part, he asserted he solely sought to obtain a civil recovery of his DivX shares relying on an expert's letter that confirmed the DivX stock was his own.

Hylton supported these assertions in a sworn declaration accompanying the motion to strike. He averred that after his termination from DivX, he had relocated to China and during the pendency of the underlying action found himself facing significant cardiac health issues requiring hospitalizations in June, July, August and November of 2008 and during the spring and summer of 2010. Hylton attached medical records from various health care facilities. He also averred that in December 2007, Herron had retained an expert, Timothy Binder, and had forwarded him Binder's opinion letter regarding Hylton's ownership of the DivX stock stating that Hylton " 'owned all of his 3,000,000 shares' and that DivX's 'Repurchase Option based upon termination for Cause either never existed or lapsed.' " Hylton averred that Binder "confirmed what Mr. Rogozienski had told me before I retained him: that I owned my DivX stock. Correspondingly, there should have been no need for Mr. Rogozienski to include such stock as part of his contingency fee."

With regard to the circumstances surrounding the filing of his fraud causes of action, Hylton stated he knew at that time that Rogozienski had included his three million DivX shares as part of his contingency fee even though Rogozienski had previously concluded Hylton owned those shares outright, and also knew Rogozienski put the ownership status of his shares at issue and then put "very little work into [the] case."

10

Hylton averred that Rogozienski had made representations to him about the extent of another DivX employee's potential stock holdings that he later discovered were untrue, and based on those representations, as well as Rogozienski's representation that Hylton could lose all of his stock if he did not settle, Rogozienski coerced him into a settlement of the *Hylton v. DivX* action that confirmed Hylton's ownership then transferred one million shares into Rogozienski's family trust. Hylton stated the underlying action involved the recovery of his DivX shares and he "bore no malice or ill will toward Mr. Rogozienski or his firm."

*Rogozienski's Opposition to Hylton's Anti-SLAPP Motion*

In opposition to Hylton's motion, Rogozienski submitted his own declaration and lodged numerous exhibits.[4] He averred that Hylton made no attempt to conduct discovery, designate or counterdesignate any experts in the underlying action, and had delayed his responses or refused to completely respond to Rogozienski's discovery, including by refusing to produce documents that would "expose the total lack of merit of [his] allegations of fraud . . . ." Rogozienski averred Hylton refused to complete his deposition despite being ordered to do so by the court, but instead unilaterally and suddenly dismissed his action.

---

[4]     Rogozienski also submitted "Separate Statement[s] of Alleged and Undisputed Facts" in opposition to Hylton's motion to strike and the Herron defendants' later motion for reconsideration. The trial court, however, sustained defendants' objections to the entirety of the statements. Rogozienski does not challenge that ruling on appeal, and thus we disregard those pleadings.

As for the merits of Rogozienski's malicious prosecution claim, Rogozienski argued the Binder letter, though inadmissible, established that Hylton's action lacked probable cause because Rogozienski had followed the expert's strategy recommendation, namely, to explain to DivX why its repurchase option had lapsed, and if unable to compromise, seek declaratory relief on that point. Rogozienski denied telling Hylton the DivX stock belonged to him and he did not have to sue for it; he stated there was an actual and ongoing dispute between Hylton and DivX over Hylton's vesting and ownership of the shares, and DivX's right to repurchase the shares registered in Hylton's name. Rogozienski denied making representations concerning other DivX shareholders stock positions, and he averred that Hylton never expressed reservations about agreeing to the settlement with DivX, but freely entered into it.

*The Herron Defendants' Reconsideration Motion*

After Hylton filed his motion, the Herron defendants moved for reconsideration of the order denying their anti-SLAPP motion. They argued newly available evidence, namely Hylton's declaration and the Binder letter, conclusively demonstrated probable cause as well as an ambiguous termination of the underlying lawsuit, and defeated any inference of malice.

*The Court's Ruling*

Ruling on the parties' evidentiary objections and taking the requested judicial notice of various documents, the court granted Hylton's motion. As to all of Rogozienski's proffered exhibits, the court sustained Hylton's objections on grounds they lacked authentication except "to the extent that other parties referenced the exhibit or

12

provided copies." It found Hylton met his burden to show the malicious prosecution action arose out of the right to petition the court, and Rogozienski failed to establish prima facie an unambiguous termination on the merits of the underlying case or malice.[5] Relying on Hylton's evidence that the reason he dismissed the underlying lawsuit was for health and financial reasons, the court ruled Rogozienski had not shown Hylton's dismissal of the underlying complaint reflected Rogozienski's innocence of the alleged misconduct. The court further ruled Rogozienski had not met his burden to show Hylton brought the malicious prosecution suit with malice; it was not sufficient by itself to show Hylton sought to rescind the attorney fee agreement based on fraudulent inducement or that Rogozienski had done what expert Binder recommended. Given its rulings on Hylton's motion, the court granted the Herron defendants' request for reconsideration, thus granting their anti-SLAPP motion.

Rogozienski appeals from the court's order.

---

5     The trial court did not address the issue of probable cause, nor does Rogozienski on appeal, other than to say that the "trial court did *not* find that Plaintiffs had failed to meet their burden to show no probable cause exists for Defendant's filing and prosecution of their [first amended complaint], and Plaintiffs do not appeal that aspect of the trial court's ruling." Herron argues Rogozienski's failure to address probable cause on appeal is fatal to his appeal, and permits us to affirm the judgment on forfeiture grounds. The authority Herron cites for this proposition pertains to a plaintiff's burden *in the trial court* for opposing an anti-SLAPP motion (*Hall v. Time Warner, Inc.* (2007) 153 Cal.App.4th 1337, 1346), or general rules regarding an appellant's burden to overcome the presumption of correctness on appeal. (*Benach v. County of Los Angeles* (2007) 149 Cal.App.4th 836, 852.) We do not decide the case on forfeiture grounds, but Rogozienski's failure on appeal to address whether he demonstrated Hylton's fraud claims lacked probable cause has some bearing on Rogozienski's burden to demonstrate prima facie the element of malice, at least to the extent he seeks to show malice on the theory that Hylton commenced or continued to pursue his action subjectively believing it to be without probable cause.

DISCUSSION

I. *Legal Standards Governing Anti-SLAPP Motions*

"The anti-SLAPP law involves a two-step process for determining whether a claim is subject to being stricken. In the first step, the defendant bringing an anti-SLAPP motion must make a prima facie showing that the plaintiff's suit is subject to [Code of Civil Procedure] section 425.16 by showing the defendant's challenged acts were taken in furtherance of his or her constitutional rights of petition or free speech in connection with a public issue, as defined by the statute. . . . [¶] If the defendant satisfies the first step, the burden shifts to the plaintiff to demonstrate there is a reasonable probability of prevailing on the merits at trial." (*Hylton I*, *supra*, 177 Cal.App.4th at p. 1271.)

" 'In order to establish a probability of prevailing on the claim . . . , a plaintiff responding to an anti-SLAPP motion must " 'state[ ] and substantiate[ ] a legally sufficient claim.' " [Citations.] Put another way, the plaintiff "must demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited." [Citations.] In deciding the question of potential merit, the trial court considers the pleadings and evidentiary submissions of both the plaintiff and the defendant . . . ; though the court does not *weigh* the credibility or comparative probative strength of competing evidence, it should grant the motion if, as a matter of law, the defendant's evidence supporting the motion defeats the plaintiff's attempt to establish evidentiary support for the claim.' " (*Taus v. Loftus* (2007) 40 Cal.4th 683, 713-714.) "In making this assessment it is 'the court's responsibility . . . to accept as true the evidence

14

favorable to the plaintiff . . . . ' [Citation.] The plaintiff need only establish that his or her claim has 'minimal merit' [citation] to avoid being stricken as a SLAPP." (*Soukup v. Law Offices of Herbert Hafif* (2006) 39 Cal.4th 260, 291 (*Soukup*).)

On appeal, this court reviews de novo the order granting defendants' motions, applying the same two-step procedure as the trial court. (*Soukup*, *supra*, 39 Cal.4th at p. 269, fn. 3; *Cole v. Patricia A. Meyer & Associates, APC* (2012) 206 Cal.App.4th 1095, 1105.) We assess the trial court's rulings on the parties' evidentiary objections for clear abuse of discretion. (*Jay v. Mahaffey* (2013) 218 Cal.App.4th 1522, 1536.)

II. *Defendants Met Their Threshold Burden to Show Rogozienski's Malicious Prosecution Action Arises From Protected Activity*

Rogozienski does not challenge the court's finding that defendants met their initial burden to show his malicious prosecution action falls within the purview of the anti-SLAPP law. Indeed, a malicious prosecution cause of action always arises from protected activity; "[b]y definition, a malicious prosecution suit alleges that the defendant committed a tort by filing a lawsuit." (*Jarrow Formulas, Inc. v. LaMarche* (2003) 31 Cal.4th 728, 735 (*Jarrow Formulas*); see *Kleveland v. Siegel & Wolensky, LLP* (2013) 215 Cal.App.4th 534, 548; *Daniels v. Robbins* (2010) 182 Cal.App.4th 204, 214-215 (*Daniels*).) This appeal turns on the second step of the anti-SLAPP inquiry: whether Rogozienski met his burden to establish a probability of prevailing on the merits of his malicious prosecution claim.

III. *Rogozienski Cannot Demonstrate A Probability of Prevailing on His Claim of*

*Malicious Prosecution*

A. *Evidentiary Rulings*

Because Rogozienski was required to meet his burden via competent and admissible evidence (*Tuchscher Development Enterprises, Inc. v. San Diego Unified Port District*, *supra*, 106 Cal.App.4th at p. 1236), we preliminarily address his challenge to the trial court's evidentiary ruling excluding most of his lodged exhibits. As stated, the court sustained Hylton's objections to Rogozienski's exhibits, ruling they lacked authentication except "to the extent that other parties referenced the exhibit or provided copies." Citing his list of lodged exhibits and *Greenspan v. LADT, LLC* (2010) 191 Cal.App.4th 486, Rogozienski challenges this ruling, arguing it is " 'routine law-and-motion practice' " for an attorney with "personal knowledge" of exhibits to provide declarations establishing their authenticity, and the writings were provided by defendants to Rogozienski and thus admitted and acted upon by defendants as authentic. Rogozienski also argues writings authored by Hylton and his agents and provided by them to him during the course of the underlying litigation are admissible under the party admission exception to the hearsay rule. In a footnote, Rogozienski states Hylton and the Herron defendants "never denied (and cannot honestly deny) the authenticity of the copies *of their own records*."

The arguments are meritless. Unlike the authority on which Rogozienski relies, Rogozienski's list of lodged exhibits is not a declaration. (See *Greenspan v. LADT, LLC*, *supra*, 191 Cal.App.4th at p. 523 ["[M]ost of Greenspan's exhibits were authenticated through declarations submitted by his attorneys, who had personal knowledge of how [a

16

joint owner of defendant] obtained the exhibits, how they had been identified, who had identified them, and their status as true and correct copies of the 'originals.' "].) Thus, the pleading does not contain a sworn statement of the foundational fact that the lodged exhibits were produced by Hylton or the Herron defendants, or any other fact from which we may infer Hylton or the Herron defendants treated them as authentic. (Compare *The Luckman Partnership, Inc. v. Superior Court* (2010) 184 Cal.App.4th 30, 34 [exhibits sufficiently authenticated by counsel who submitted a declaration that he had personal knowledge that attached documents were a party's verified interrogatory responses in the action, along with exhibits included with those responses].) Nor did Rogozienski include such foundational averments in his declarations opposing the anti-SLAPP motions, in which he merely cited to some of the proffered exhibits. As for Rogozienski's latter point, it is of course his burden to present competent evidence in opposition to defendants' anti-SLAPP motions; defendants' failure to deny the authenticity of Rogozienski's lodged exhibits is irrelevant. Rogozienski has not demonstrated the court abused its discretion by excluding his exhibits as unauthenticated, and thus we do not consider them in assessing whether he met his burden to show a probability of prevailing on the merits of his malicious prosecution complaint.

Rogozienski additionally contends the court reversibly erred when it based its rulings on copies of what Hylton claimed were his medical records and a copy of the Binder letter. As for evidence of Hylton's general health, medical conditions, and multiple hospitalizations, we need not decide whether Hylton's lodged medical records were properly authenticated, as Hylton possesses personal knowledge of and is competent

17

to provide evidence of those general matters, as well as the fact that his poor health was one reason for his decision to dismiss the underlying action. (Evid. Code, § 702; *People v. Montoya* (2007) 149 Cal.App.4th 1139, 1150 [to testify, a witness must have personal knowledge of the subject of the testimony based on the capacity to perceive and recollect]; *Waite v. Godfrey* (1980) 106 Cal.App.3d 760, 764 [no error to admit plaintiff's testimony concerning her own physical condition which she claimed caused her to miss 24 months of work]; *Frederick v. Federal Life Ins. Co.* (1936) 13 Cal.App.2d 585, 590 [witness need not be an expert to testify concerning whether he has had a particular disease, as it is a matter of fact known to himself]; *Love v. Wolf* (1967) 249 Cal.App.2d 822, 833 [a witness may always testify to his or her own state of mind when it becomes a material fact in the case]; accord, *McDonald v. Superior Court* (1994) 22 Cal.App.4th 364, 370 [plaintiff's personal declaration as to her own financial condition and its impact on her ability to proceed with litigation was competent evidence].)

As for the import of the Binder letter, Hylton was capable of testifying generally that he relied upon an expert opinion in proceeding with his fraud claims against Rogozienski. With regard to its authenticity, we observe Rogozienski relied on the Binder letter below to demonstrate Hylton's case lacked probable cause. A writing may be authenticated by evidence that it has been acted upon as authentic by the party against whom it is offered. (Evid. Code, § 1414; *Ambriz v. Kelegian* (2007) 146 Cal.App.4th 1519, 1527 [trial court erred by sustaining party's general objections to excerpt from deposition as unauthenticated where the party sought to use portions of the deposition in support of its summary judgment motion].) Under these circumstances, we cannot say

18

the court manifestly abused its discretion by overruling Rogozienski's objection to the Binder letter's authentication.

## B.  *Elements of Malicious Prosecution*

To establish a claim for malicious prosecution, a plaintiff is required to demonstrate that the underlying action (here, Hylton's first amended complaint for fraud and rescission based on fraud) "(1) was commenced by or at the direction of the defendant and was pursued to a legal termination favorable to the plaintiff; (2) was brought without probable cause; and (3) was initiated with malice."  (*Soukup*, *supra*, 39 Cal.4th at p. 292.)  A plaintiff may also prevail by showing defendants "maliciously continued to prosecute the case against him . . . without probable cause."  (*Cole v. Patricia A. Meyer & Associates, APC*, *supra*, 206 Cal.App.4th at p. 1105, citing *Zamos v. Stroud* (2004) 32 Cal.4th 958, 973.)

The malice element of a malicious prosecution action goes to the defendant's subjective intent or purpose in initiating the prior action.  (*Kleveland v. Siegel & Wolensky, LLP*, *supra*, 215 Cal.App.4th at pp. 553-554; *Daniels*, *supra*, 182 Cal.App.4th at p. 224.)  It is usually proven by circumstantial evidence and inferences from the evidence.  (*Jay v. Mahaffey*, *supra*, 218 Cal.App.4th at p. 1543.)  " 'The motive of the defendant must have been something other than that of . . . the satisfaction in a civil action of some personal or financial purpose.  [Citation.]  The plaintiff must plead and prove actual ill will *or* some *improper* ulterior motive.'  Improper purposes can be established in cases in which, for instance (1) the person bringing the suit does not believe that the claim may be held valid; (2) the proceeding is initiated primarily because

19

of hostility or ill will; (3) the proceeding is initiated solely for the purpose of depriving the opponent of a beneficial use of property; or (4) the proceeding is initiated for the purpose of forcing a settlement bearing no relation to the merits of the claim. [Citation.] If the prior action was not objectively tenable, the extent of a defendant's attorney's investigation and research may be relevant to the further question of whether or not the attorney acted with malice." (*Daniels*, at pp. 224-225.)

"The lack of probable cause is one factor in determining the presence of malice, but alone it is insufficient. [Citation.] 'Merely because the prior action lacked legal tenability, as measured objectively (i.e., by the standard of whether any reasonable attorney would have thought the claim tenable [citation]), *without more*, would not logically or reasonably permit the inference that such lack of probable cause was accompanied by the actor's subjective malicious state of mind. In other words, the presence of malice must be established by other, additional evidence.' " (*Jay v. Mahaffey*, *supra*, 218 Cal.App.4th at p. 1543; see also *Jarrow Formulas*, *supra*, 31 Cal.4th at p. 743.)

C. *Rogozienski Has Not Demonstrated a Prima Facie Case of Malice*

Rogozienski contends he made a prima facie showing of malice as to both Hylton and the Herron defendants. He points out that malice may be inferred when a party knowingly brings an action without probable cause, and asserts the "overwhelming evidence," which he does not describe in connection with his malice argument, shows defendants "knowingly alleged and prosecuted claims of 'actual fraud' they knew were fabricated, factually baseless and totally and completely without merit."

20

Additionally, as to the Herron defendants, Rogozienski as indicated above averred in his declaration that they "harbored ill will against plaintiffs herein because immediately prior to filing the underlying litigation, defendants were abruptly discharged in an unrelated fee-for-service matter they were handling for a client who was dissatisfied with their work and replaced them with [Rogozienski]." (Some capitalization omitted.) Rogozienski further averred, on information and belief, that "Herron has a practice and a long history of initiating and prosecuting meritless actions and proceedings, and has been sanctioned and has been sued for malicious prosecution by reason thereof." According to Rogozienski, this evidence and the inferences drawn from it are sufficient to establish Hylton and the Herron defendants acted with malice.

1. *Malice as to Herron*

Even if we were to accept the statements concerning the Herron defendants in Rogozienski's declaration as true, the inferences Rogozienski asks us to draw from it— that the Herron defendants harbored actual ill will because an unidentified client replaced them with Rogozienski, or that the Herron defendants acted with malice *in this case* because it has previously brought meritless actions or acted with malice in *other* cases— are simply not logical or reasonable. An opposition to an anti-SLAPP motion may not be based on speculative inferences. (See *Kashian v. Harriman* (2002) 98 Cal.App.4th 892, 931-933 [plaintiff failed to demonstrate a probability of prevailing on his defamation cause of action because he relied on a "series of speculative inferences" from evidence purporting to show actual malice]; *Wilcox v. Superior Court* (1994) 27 Cal.App.4th 809, 828 [a reasonable inference " ' " 'may not be based on suspicion alone, or on imagination,

21

speculation, supposition, surmise, conjecture or guess work' " . . . [but] must logically flow from other facts established in the action' "], disapproved on other grounds in *Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 68, fn. 5.)

Rogozienski's other asserted evidence is like that found insufficient to make out a prima facie showing of malice for purposes of malicious prosecution in *Daniels*, *supra*, 182 Cal.App.4th 204. Rogozienski's assertions about the evidence of malice are vague and unspecific. Nevertheless, Rogozienski's opposing anti-SLAPP declaration indicates that the basis for his claim of malice is that defendants: refused and delayed in responding to discovery; identified only two witnesses with knowledge of Hylton's fraud allegations; never designated experts; and suddenly dismissed the action with trial set to commence in less than two months. He asserts the action was brought without probable cause, and that when he met with Herron to discuss the factual basis for the first amended complaint, Herron "presented no facts which could support the allegations of fraudulent misconduct." Rogozienski maintains Herron has never explained why Hylton stopped communicating with them directly, and refused to disclose Hylton's last known address.

*Daniels* involved a claim of malicious prosecution brought by Wilhelmina Daniels against attorneys (the Quinlivan attorneys) after the court issued terminating sanctions and dismissed an underlying defamation action. (*Daniels*, *supra*, 182 Cal.App.4th at p. 211.) The plaintiff in the underlying defamation action, Young, had refused to follow the court's orders or comply with his discovery obligations. (*Ibid.*) Daniels's evidence of malice primarily consisted of the total lack of merit in the allegations made in the underlying defamation action. But the *Daniels* court pointed out that this was insufficient

22

to show malice on the part of the Quinlivan attorneys, explaining that the California Supreme Court had observed that even where no competent evidence is adduced during discovery to support claims in an underlying action, this does not on its own support a finding of malice in an anti-SLAPP hearing. (*Id.* at p. 225, citing *Jarrow Formulas*, *supra*, 31 Cal.4th at p. 743.) The appellate court further observed that the record permitted a fair inference that the Quinlivan attorneys had failed to adequately investigate the factual assertions made by their client before suing the anti-SLAPP moving party, but it held the attorney's "negligence in conducting factual research is also not enough on its own to show malice." (*Daniels*, at p. 225.)

As for the moving party's claim that it presented evidence the Quinlivan attorneys knowingly continued to prosecute the action without probable cause, the court rejected the contention. It found "dispositive" that Daniels's claim of potential liability was that the underlying factual allegations of defamation lacked evidentiary support, unlike other cases such as *Zamos v. Stroud*, *supra*, 32 Cal.4th 958, where the factual allegations were explicitly disproved by sworn deposition testimony of the attorneys' own client.[6] The *Daniels* court stated, "The Quinlivan Attorneys' sustained inability to provide any support for Young's allegations, on its own, does not allow an inference that they knew there was

---

[6]    In *Zamos v. Stroud*, *supra*, 32 Cal.4th 958, the evidence showed the attorney defendants to a malicious prosecution action had brought a fraud claim based on the representations of their client, but shortly after the case was filed had received reporters' transcripts of three hearings that the defendant contended proved the fraud claim had no merit. (*Id.* at pp. 961-962, 971.) The attorney defendants refused to dismiss the lawsuit despite the transcripts, and the court, after warning counsel that their client's testimony would be perjurious in view of the transcripts, eventually granted nonsuit. (*Id.* at pp. 962-963.)

no probable cause for continuing to prosecute the underlying action." (*Daniels*, *supra*, 182 Cal.App.4th at p. 227.)

The malicious prosecution plaintiff in *Daniels* also relied on evidence of settlement discussions in which Young offered to dismiss his complaint with prejudice conditioned on a waiver of all malicious prosecution claims. (*Daniels*, *supra*, 182 Cal.App.4th at p. 227.) But the Court of Appeal declined to impute Young's conduct, including his settlement position, to his attorneys. (*Ibid.*) And it held the offer to dismiss in exchange for a release of all claims was not equivalent to the bad faith attempt to " 'squeeze a settlement . . . on a baseless case' " in *HMS Capital, Inc. v. Lawyers Title Co.* (2004) 118 Cal.App.4th 204 (*HMS Capital*), in which the plaintiff refused to dismiss a frivolous case unless the defendant paid $25,000. (*Id.* at pp. 217-218.) The *Daniels* court concluded: "In sum, the evidence marshaled against the Quinlivan Attorneys is as follows: an apparent lack of evidentiary support for the factual allegations in the underlying action; a lack of factual investigation as evidenced by an inability to provide formal or informal discovery; a client who may have had actual ill will against Wilhelmina; and a refusal by Young to dismiss without a waiver of claims by Wilhelmina. This record, which lacks any affirmative evidence that the Quinlivan Attorneys met the requirements of malice, including knowledge the case lacked probable cause, is insufficient as a matter of law to establish malice as to the Quinlivan Attorneys." (*Daniels*, 182 Cal.App.4th at p. 227.)

Under *Daniels*, *supra*, 182 Cal.App.4th 204, even if we were to assume Hylton's fraud allegations are without factual support, that is not enough to make out a prima facie

24

case of Herron's malice, nor is Hylton's lack of cooperation in discovery imputable to his attorneys. Though Rogozienski suggests Hylton and the Herron defendants sought to force a settlement having no relation to the merits of the claim,[7] he does not cite evidence that they made an unreasonable settlement demand, or any settlement demand whatsoever, in the malicious prosecution action. We are unable to conclude the Herron defendants acted in bad faith or intended to force a monetary settlement at Rogozienski's expense, when there is no indication, as in *HMS Capital*, that they insisted on some form of payment for dismissing the case. (*HMS Capital*, *supra*, 118 Cal.App.4th 204, 217, 218.) There is no other evidence from which we may infer the Herron defendants pursued the action to force a settlement. (E.g., *Sycamore Ridge Apartments LLC v. Naumann* (2007) 157 Cal.App.4th 1385, 1407-1408 [evidence that attorneys filed a

_____

7        Rogozienski asserts: "Defendants further knew that by seeking rescission and 'the civil recovery of [Hylton's] . . . DivX shares . . . that during the pendency of the underlying action, those shares in the hands of [Rogozienski] might be clawed back and thus would effectively be 'locked up' because if disposed of, plaintiffs would have to purchase replacement shares at any increase in the value, thereby depriving plaintiffs of the beneficial use of those shares during the pendency of the underlying action and laying the groundwork for the settlement which defendants hoped to achieve based on the seriousness of the factually baseless allegations and the economic risk to plaintiffs of any sale. When all that failed and defendants were facing a continuation of Hylton's deposition, producing all of Hylton's documents, providing code-compliant discovery responses and trial which would further expose that defendants' claims were factually baseless and completely without merit, defendants unilaterally and suddenly caused the underlying action to be dismissed." (Some capitalization and italics omitted.) These assertions are supported only by citations to Rogozienski's points and authorities filed below in opposition to the anti-SLAPP motions,, and the portion of Hylton's declaration in which Hylton averred he sought only the civil recovery of his DivX shares. Hylton correctly points out that Rogozienski cites no authority or evidence that such a clawback procedure could have happened, nor does Rogozienski cite evidence that Hylton knew of such a potential consequence or tried to make it happen.

25

statement of damages after the plaintiff tenant in the underlying action had provided interrogatory responses stating she had suffered no compensable injuries or property loss permitted an inference the proceedings were initiated to force the defendant to enter into a settlement unrelated to the merits of the plaintiff's claims]; see also *Jay v. Mahaffey*, *supra*, 218 Cal.App.4th at pp. 1529, 1544-1545 [evidence of malice in part shown by counsel's threats of ongoing litigation if the defendant limited partners did not seriously discuss settlement, as well as counsel's knowledge that the limited partners had limited exposure and statement that they " 'were "not really at fault" ' and had been sued ' "to get their attention" ' "].)  In sum, Rogozienski has not presented evidence from which we can reasonably infer the Herron defendants acted with the subjective intent to deliberately misuse the legal system, or with an improper purpose in either instituting, or continuing, Hylton's underlying fraud action.

We observe the Herron defendants' success on their motion was the result of the trial court's grant of reconsideration.  Rogozienski does not challenge that procedural matter, the "new or different facts" standards, or other requirements for a reconsideration motion.  (Code Civ. Proc., § 1008, subd. (a).)  Hence, there is no basis to alter our decision based on the manner in which the court granted the Herron defendants' anti-SLAPP motion.

2.  *Malice as to Hylton*

Nor can we conclude Rogozienski has made the requisite showing of malice as to Hylton.  As stated, Rogozienski must demonstrate his claim is legally sufficient and supported by a prima facie showing of facts which, if proved via direct or circumstantial

26

evidence at trial, would support a judgment in his favor. (*Taus v. Loftus*, *supra*, 40 Cal.4th at pp. 713-714; *Jay v. Mahaffey*, *supra*, 218 Cal.App.4th at p. 1543.) In assessing his showing, we keep in mind that it is not our task to resolve factual disputes or make credibility determinations on Hylton's anti-SLAPP motion; we accept Rogozienski's evidence as true for purposes of our analysis. (*Freeman v. Schack* (2007) 154 Cal.App.4th 719, 733.) But here, we have found no abuse of discretion in the trial court's exclusion of a significant portion of Rogozienski's evidence; and do not consider such inadmissible or incompetent evidence in the probability-of-prevailing analysis.

As with the Herron defendants, there is no evidence in the record that Hylton demanded some form of payment in exchange for dismissing his case, or that he made any other quid pro quo demand on Rogozienski that can be characterized as an effort to settle. Rogozienski has not met his burden to present facts from which we may infer Hylton commenced or pursued his fraud action to coerce a settlement having no relation to his claims. To infer such a tactic merely by the filing of an arguably meritless lawsuit is speculation, and would render every meritless lawsuit a malicious prosecution regardless of the existence of actual malice.

Rogozienski characterizes the evidence as "overwhelming" that Hylton *knowingly* commenced and prosecuted fraud claims that he knew were baseless or totally and completely without merit, establishing malice. As stated, " '[m]alice may also be inferred from the facts establishing lack of probable cause.' " (*Soukup*, *supra*, 39 Cal.4th at p. 292.) In *Soukup*, the court concluded malice could be inferred from the evidence that the defendants lacked probable cause to initiate and maintain their action against the plaintiff,

27

where the defendants knew they lacked any evidence connecting the plaintiff to other tortfeasors. (*Id*. at pp. 295-296; see also *Sycamore Ridge Apartments LLC v. Naumann*, *supra*, 157 Cal.App.4th at p. 1407 [evidence tending to show defendants did not subjectively believe the action was tenable is relevant to whether an action was instituted or maintained with malice]; *Jay v. Mahaffey*, *supra*, 218 Cal.App.4th at p. 1546 [evidence of malice by a party who wished to sell and redevelop property and end a lease shown by his conduct in trying to strike a side deal with the defendant's president, organize the defendant's limited partners against it, and persuade a city to threaten condemnation to achieve its goal of terminating the lease; these facts, taken together with the lack of probable cause for an action against the limited partners, raise an inference that the party "did not bring the limited partners into the case because [he] truly believed they were liable, but as another tactic to create enough misery for [the defendant] that [it] would settle the case"].) On this point, Rogozienski's burden on appeal is to explain how, in opposition to Hylton's anti-SLAPP motion, he pointed to facts that, if true, would establish Hylton knew when he filed the first amended complaint, or discovered at some point during the litigation, his claims lacked probable cause.[8]

---

[8] The probable cause inquiry is whether, applying an objective standard to the facts known to Hylton, the institution of his prior fraud action was "*arguably tenable*, i.e., not so completely lacking in apparent merit that no reasonable attorney would have thought the claim tenable." (*Jay v. Mahaffey*, *supra*, 218 Cal.App.4th at p. 1540; see *Wilson v. Parker, Covert & Chidester* (2002) 28 Cal.4th 811, 817 [probable cause is a lenient standard; attorneys and litigants have a right to present issues that are arguably correct, even if success is " ' "extremely unlikely" ' "], abrogated by statute on other grounds as stated in *Hutton v. Hafif* (2007) 150 Cal.App.4th 527, 547.) Both the factual circumstances established by the evidence and the legal theory upon which relief is

Hylton's action was based on fraudulent inducement; that Rogozienski had reviewed the terms of the founder stock purchase agreement and knew that DivX had failed to meet the necessary conditions to exercise its right to repurchase his shares, namely, written notice to Hylton or his legal representative and tender of cash payment to an escrow agent within 60 days after the date of mailing of the notices. Hylton's theory was that despite this, Rogozienski advised him to sue DivX for the stock, which then had substantial value, and included any and all stock recoveries as part of an ethically impermissible contingent fee. Hylton's declaration established that, as of August 2003, DivX had not timely exercised its rights under the founder stock purchase agreement, but Rogozienski had advised him in any event to sign a contingent fee agreement that would include one-third of all of Hylton's DivX shares, even those shares that had "vested" as of February 1, 2001. Hylton claimed Rogozienski also represented Hylton could lose the stock unless he agreed to settle the *Hylton v. DivX* action, and made other representations as to the possible dilution of Hylton's stock by another DivX employee's potential stock holdings in order to induce Hylton to settle his case. Given this theory, Hylton's failure to designate witnesses other than himself and Rogozienski is not indicative of malice, as the claim is based on misrepresentations between the two men at or about the time Hylton

sought are relevant. (*Jay v. Mahaffey*, at p. 1540.) This standard is not met by evidence that Hylton's fraud claims merely lacked merit; it must be demonstrated that any reasonable attorney would agree the claims are *totally and completely* without merit. (*Jarrow Formulas*, *supra*, 31 Cal.4th at p. 743, fn. 13.) "[E]very case litigated to a conclusion has a losing party, but that does not mean the losing position was not arguably meritorious when it was pled. [Citation.] And just as an action that ultimately proves nonmeritorious may have been brought with probable cause, successfully defending a lawsuit does not establish that the suit was brought without probable cause." (*Id*. at p. 743.)

signed the legal services contract or settled the case. And Hylton not only possessed an expert opinion supporting the premise of his fraud claim, but the trial court deemed his allegations sufficient to state with particularity a claim for actual fraud. These facts support a conclusion that Hylton subjectively believed in the legal tenability of his fraud and fraud-related claims. There is no evidence, as in *Daniels*, *supra*, 182 Cal.App.4th at pp. 222-223, that Hylton was or became aware of evidence disproving his fraud claims or otherwise a complete absence of supporting evidence, that would render it unreasonable to prosecute Hylton's claims.

There are several reasons why Rogozienski's showing is insufficient to establish a prima facie case of malice on the theory that Hylton knowingly initiated or prosecuted totally meritless fraud claims. As to Hylton's subjective beliefs about the asserted total lack of merit to his claims, Rogozienski largely relies on evidence properly excluded by the trial court. He points to Hylton's business experience and purported knowledge that DivX terminated him for cause; he relies on negotiations between Hylton and DivX in connection with their dispute as well DivX's discovery responses, a mediation, and a settlement conference between them. In particular, Rogozienski asserts DivX gave notice during settlement negotiations of its exercise of the repurchase option via a proposed separation and release agreement delivered to Hylton. We have upheld the trial court's exclusion of all of this evidence as unauthenticated.

Otherwise, Rogozienski's evidence shows he did not make the representations that Hylton claimed he had made to induce Hylton to execute the legal services contract and settle the *Hylton v. DivX* action; Hylton approved the accuracy of the *Hylton v. DivX*

30

complaint's allegations and willingly entered into the contingent fee agreement; and there was a dispute over the vesting of some of Hylton's DivX stock, evidenced by the settlement of Hylton's action against DivX. In opposition to Hylton's anti-SLAPP motion, Rogozienski asserted that, apart from Hylton's statement that he acted without ill will, Hylton "offers absolutely no evidence to support any *factual* basis whatsoever for the core allegations which set forth the essential elements of the *alleged* claims of actual fraud . . . ." But this argument misperceives the burdens on an anti-SLAPP motion; it is Rogozienski's burden to demonstrate a probability of prevailing on his malicious prosecution claim, not Hylton's burden to demonstrate merit to his underlying claims.

Second, Rogozienski does not address how Hylton's fraud claims lack probable cause in the first instance. (See footnote 5, *ante*.) He therefore has not explained how the evidence establishes, or gives rise to an inference, that Hylton's fraud claims were utterly lacking in either direct or circumstantial evidence, much less that Hylton subjectively believed this was the case. Rogozienski has not presented competent evidence that Hylton became aware of verifiable facts disproving his fraud allegations or demonstrating their falsity (e.g., *Daniels*, *supra*, 182 Cal.App.4th at p. 223), that a witness recanted testimony supporting Hylton's claims, that Hylton gave perjured deposition testimony, or any other evidence indicative that Hylton brought or maintained his action *knowing* it to be without probable cause.

Rogozienski suggests Hylton's failure to himself propound discovery, designate experts, or respond completely to all of the discovery, should be calculated into the malice inquiry. Rogozienski does not explain what expert testimony was required, or

31

why an expert was necessary to prove Hylton's claim of fraudulent inducement. Though a party's failure to investigate or conduct discovery may be assessed on the question of an improper ulterior motive, it is usually accompanied by some other evidence to meet the standard. (See *HMS Capital*, *supra*, 118 Cal.App.4th at pp. 216-217 [undisputed evidence that a title company never discussed a cancellation fee during contract negotiations or advised that such a fee would be due, did not ordinarily charge such a fee, and that such fees were not a standard in the industry, combined with the fact the title company took no depositions, served only one set of form interrogatories, and refused to dismiss its case unless its opponent paid $25,000, established the title company's malice in bringing an underlying breach of contract action premised on the party's failure to pay a cancellation fee]; see also *Daniels*, *supra*, 182 Cal.App.4th at p. 227 [apparent lack of evidentiary support combined with possible ill will, lack of discovery responses, and request for waiver of claims in exchange for dismissal insufficient to show malice; failure to investigate facts by itself will not suffice to make a prima facie case of malice].) Hylton's failure to conduct discovery or designate experts, and his failure to provide further responses to discovery, does not by itself permit an inference of malice, particularly where the question of Hylton's entitlement to his shares in significant part turned on an interpretation of the founder stock purchase agreement, a question of law.

As we have pointed out, the absence of probable cause does not by itself permit an inference of malice. Rogozienski must point to some evidence apart from the lack of merit to the underlying case. Rogozienski's additional evidence of malice is a theory that Rogozienski did not raise in his opposition papers below: Hylton's declaration that

32

Rogozienski "laughed at" him during their September 2006 telephone call, and Hylton's claim that Rogozienski expressed some advantage as to his stock because Rogozienski was not a party to the settlement agreement. This, Rogozienski asserts, demonstrates that Hylton was "upset and hostile" toward him. Evidence of malice may be inferred where the tone of the relationship between a plaintiff and defendant is "hostile and divisive." (*Oviedo v. Windsor Twelve Properties, LLC* (2012) 212 Cal.App.4th 97, 102-103, 114 [tenant established probability of prevailing on claim for malicious prosecution of an unlawful detainer action with evidence that a managing member of the defendant, Myers, posted a three-day notice to quit because the tenant was late with her rent but admitted the tenant had accused him of intimidation and that he had earlier referred to complaints about noise problems; Myers reported the tenant to the Department of Children and Family Services after learning she had adopted a daughter; Myers admitted that when he met with counsel he wanted to evict the tenant due to her late rent payments, noise, and her daughter being left unsupervised; and Myers specifically raised the tenant's rent with the intent to sue her].) Malice can be inferred from a party's affirmative pre-litigation conduct in furtherance of some underlying improper purpose unrelated to the merits of a lawsuit. Even if we were to consider this new factual theory on appeal, we conclude the circumstances described by Rogozienski do not permit a *reasonable* or nonspeculative inference of Hylton's hostility and divisiveness toward Rogozienski, ill will, or Hylton's improper purpose in bringing, or continuing to prosecute his claims.

33

Having concluded Rogozienski cannot meet his burden to make out a prima facie case of malice, an essential element of his malicious prosecution claim, we need not reach the remaining issues.

## DISPOSITION

The order is affirmed.


O'ROURKE, J.

WE CONCUR:


BENKE, Acting P. J.


IRION, J.

34